[Crim. No. 851. Fifth Dist. July 23, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
ALFREDO PACHECO ACOSTA, Defendant and Appellant.

898

---

## COUNSEL

Alfredo Pacheco Acosta, in pro. per., and James M. Stuart, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch and Evelle J. Younger, Attorneys General, Daniel J. Kremer, Nelson P. Kempsky and Marjory Winston Parker, Deputy Attorneys General, for Plaintiff and Respondent.

---

## OPINION

**STONE, P. J.**—Defendant appeals from his conviction of murder, first degree, on four counts.

In the early morning hours of August 14, 1966, defendant returned home to discover his wife was absent. Shortly thereafter, a man drove his car to the rear of the premises and let the wife out; she entered the home, and a quarrel ensued. Defendant shot his wife, his mother-in-law and his brother-in-law. He then took his children to the home of a cousin. He told the cousin what he had done, gave him instructions concerning the children, handed him the revolver he had used to kill his victims, and told him he was going to give himself up to the authorities. The cousin telephoned the police headquarters and repeated what defendant had told him about the killings. However, defendant did not go to the police station; rather, he went to the home of his paramour. After talking with her for some time, he strangled her to death. Then he switched the porch light on and off to attract the attention of an officer who was sitting in a police car at a curb nearby. This was about 5:30 a.m. Defendant told the officer he was the wanted man, that he had shot his people. After the officer placed defendant in the patrol car, defendant said: "My girl friend I think she just died." The officer asked him where she was, and he nodded toward the house, which the officer entered. He found the woman's body lying on a bed.

Defendant was charged with four counts of first degree murder; he pleaded not guilty and not guilty by reason of insanity. In a trial to the court without a jury, defendant was found guilty on all four counts, and sentenced to life imprisonment.

By reason of the plea of not guilty by reason of insanity, the court appointed three Bakersfield psychiatrists to examine defendant. At defendant's request, the court also appointed a Los Angeles psychiatrist to examine him. The Los Angeles doctor was associated with a group specializing in neurological medicine and defendant was given various physical and neurological tests, as well as being tested by a clinical psychologist and a psychiatrist.

 Defendant first contends the trial judge erred in not ordering the question of his sanity determined at the time of trial pursuant to Penal Code section 1368. He argues that his mental incompetency to stand trial was established as the law of the case by the Supreme Court opinion in *People v. Acosta,* 71 Cal.2d 683 [78 Cal.Rptr. 864, 456 P.2d 136]. However, the question before the court in that case was whether defendant was entitled to file a late appeal. To become the law of the case a point of law must have been actually presented to and determined by an appellate court. (*People v. Sigal,* 249 Cal.App.2d 299, 311 [57 Cal.Rptr. 541].) Only matters occurring *after* judgment of guilt were relevant to defendant's request to file a late appeal; the Supreme Court did not review the trial of the case on the merits.

■ Consequently, we examine the contention in the light of the record before us. Each of the doctors who examined defendant, both on behalf of the People and his own behalf, testified that he was mentally competent to proceed with the trial. There is no evidence that would have indicated to the judge at any time during trial that defendant was mentally incompetent or unable to assist his attorney in the preparation of his case.

It is not the time the crime is committed, but the time of trial that is crucial in a Penal Code section 1368 proceeding. Since defendant has not presented "substantial evidence of present mental incompetence" (*People v. Beivelman,* 70 Cal.2d 60, at p. 71 [73 Cal.Rptr. 521, 447 P.2d 913]) the case does not come within the ambit of Penal Code section 1368. It is clear from the record that his counsel did not believe defendant was suffering any "present" mental difficulty that would interfere with his going to trial because, when the clerk of the trial court inquired about a hearing as to present sanity in view of defendant's plea of not guilty by reason of insanity, defense counsel remarked to the court: "The doctors have filed their reports indicating he is presently sane and there was no motion to test present sanity, it would be my feeling that there would be no hearing until the time of trial and just the issue of guilt would be determined. THE COURT: I agree unless you want—MR. DALY: There is nothing to be done."

■ Defendant asserts that he did not knowingly and intelligently waive his right to a jury trial. He alleges this waiver was made a part of his waiver of an early trial date, implying that in order to "buy" time for psychiatric examination he had to waive both time of trial and right to jury trial. The waiver of a trial date came about when his attorney asked the court to appoint a psychiatrist in Los Angeles to examine defendant, and to continue the trial date to permit the examination and allow counsel time to communicate with the examining doctors and analyze the results of the examination. The trial court appointed the Los Angeles doctor as defendant requested, and ordered defendant transported to Los Angeles for the purpose of examination. At the same time the case was continued after the nature of the proceeding was explained to defendant *through an interpreter.* He personally waived time. A new trial date was set to which defendant also agreed. All these proceedings were at the request of defense counsel and with the personal concurrence of defendant as well as the district attorney.

When this transaction was concluded, Mr. Daly, defense counsel, addressed the court as follows:

"If the Court please, the defendant has discussed his preference to waive a jury in this matter and have the matter tried by the court.

"MR. BRADSHAW: [assistant district attorney] Do you wish to have the defendant make a personal waiver?

"MR. DALY: I think certainly we should have a personal waiver.

"THE COURT: Yes, we should and we might as well have it now.

"MR. DALY: Might as well.

"THE COURT: Mr. Acosta, your attorney, Mr. Daly, has indicated to the court that you are willing to waive your right to a jury trial and to have the case tried, heard, by a judge and a decision made by a judge without a jury."

(Statement in Spanish by the interpreter)

"THE COURT: You are entitled to a jury trial."

(Statement in Spanish by the interpreter)

"THE COURT: Accordingly, the Judge can not hear this case without a jury unless you, yourself, personally waive the jury."

(Statement in Spanish by the interpreter)

"THE COURT: Do you desire to waive the jury and have your case heard by a judge without a jury?"

(Statement in Spanish by the interpreter and by the defendant in Spanish)

"A. Without a jury. By the judge."

"THE COURT: Are you personally waiving your right to a jury trial?"

(Statement in Spanish by the interpreter)

"THE COURT: What is his answer?"

(Statement in Spanish by the interpreter and statement in Spanish by the defendant)

"A. Yes."

As far as the record is concerned, there is nothing to indicate that defendant did not understand his right to a jury trial, or that he did not knowingly waive that right, or that he was coerced or deceived into waiving his right to a jury trial.

In a supplemental brief filed in propria persona, defendant asserts that

he did not know what a jury is or what it meant to waive trial by jury and to be tried by a judge. We gather he is arguing that he did not understand the advantages and disadvantages of each kind of trial, and, consequently, he did not knowingly waive his right to trial by jury. We are not aware of any rule of law that entitles a defendant who is represented by counsel and who has discussed waiver of a jury trial with his counsel, as here, to have the court advise him of the merits or the disadvantages of a trial by jury, as against a court trial. In this connection, it is to be noted that defense counsel speaks Spanish and that he discussed this matter in Spanish with defendant. Experienced attorneys differ as to the advantages and disadvantages of trial by jury in certain criminal cases. For instance, the personality of the trial judge may be a persuasive factor. Certainly a court is in no position to discuss the merits of the two kinds of trial, either philosophically or tactically, with a defendant where the defendant is represented by competent counsel. It is enough that the court determine that the defendant understands that he is to be tried by the court and not a jury. In *People* v. *Evanson,* 265 Cal.App.2d 698 [71 Cal.Rptr. 503], a waiver made under circumstances similar to the case at bench was held to be effective. (See also *People* v. *Lookadoo,* 66 Cal.2d 307, 311 [57 Cal.Rptr. 608, 425 P.2d 208].)

■ Defendant's next point concerns his confessions or admissions made to an officer shortly after his apprehension. Although the officer explained defendant's rights to him in Spanish, he used the word "lawyer" rather than the Spanish equivalent. The court found that it was not clear that defendant understood the meaning of the word "lawyer," and ordered the admissions and confessions suppressed. Defendant asserts that in determining the admissibility of his confession, the trial judge should not have listened to the substance of the confession. Before the tape was played, the judge ordered that the tape recorder be stopped when the confession was reached; the record reflects that his instruction was followed and that he heard only the part concerning the preliminary admonition, not the substance of the confession. Moreover, this point was not raised below; there was no objection made to the manner in which the tape was played or to what the judge heard.

Defendant points out that *Jackson* v. *Denno,* 378 U.S. 368 [12 L.Ed.2d 908, 84 S.Ct. 1774, 1 A.L.R.3d 1205] requires *voir dire* proceedings for determination of the admissibility of a confession to be heard outside the presence of the jury. He argues that this holding implies that where a case is tried without a jury, a different judge from the one who is trying the case must hear the *voir dire* examination. This question was considered in a somewhat different context in *People* v. *Carroll,* 4 Cal.App.3d 52 [84 Cal.Rptr. 60], and this court held that Evidence Code section 405,

subdivision (a), governs the procedure to be followed when the admissibility of a confession is raised at trial. Subdivision (a) of section 405 reads: "When the existence of a preliminary fact is disputed, the court shall indicate which party has the burden of producing evidence and the burden of proof on the issue as implied by the rule of law under which the question arises. The court shall determine the existence or nonexistence of the preliminary fact and shall admit or exclude the proffered evidence as required by the rule of law under which the question arises."

In commenting upon Evidence Code section 405, subdivision (a), in relation to *voir dire* procedure, we said, in *Carroll,* at page 59: "Preliminarily, we note that the section not only follows the mandate of *Jackson* v. *Denno,* 378 U.S. 368 [12 L.Ed.2d 908, 84 S.Ct. 1774, 1 A.L.R.3d 1205], in delineating a *voir dire* procedure outside the presence of the jury to determine admissibility of confessions, but also, as far as California is concerned, settles two questions that were not reached in the *Jackson* opinion. The first is whether the *voir dire* hearing on admissibility must be heard by a different judge or jury from the judge who is trying the case. Section 405 directs *the court* to *determine* the 'preliminary fact.' In this context the term, 'the court,' would include any judge of the court in which the case is pending, so that the judge who tries the case need not call in another judge, but himself may hear the *voir dire* examination, as here."

We believe the same reasoning applies to a nonjury trial, and that it is permissible for a trial judge trying a case without a jury to conduct the *voir dire* hearing and determine the admissibility of a confession.

■ Defendant argues that although the trial court properly suppressed his confessions and admissions to the officers because he did not understand his *Miranda* rights when he waived them, the court erred in admitting similar admissions and confessions made to the doctors who examined him, which statements were used to impeach his testimony. In his in propria persona brief he says that the statements given to the doctors were "so inextricably bound to the former [suppressed statements made to the police] as to forbid separation by 'being sufficiently distinguishable' from the underlying illegality 'to be purged of the primary taint,' " citing *Wong Sun* v. *United States,* 371 U.S. 471 [9 L.Ed.2d 441, 83 S.Ct. 407], and *Harrison* v. *United States,* 392 U.S. 219 [20 L.Ed.2d 1047, 88 S.Ct. 2008]. What defendant is saying is that his incriminating statements made to the police were held to be inadmissible because the officer eliciting them failed to define the term "lawyer," but the same statements made to psychiatrists were used to impeach his testimony.

The case was briefed before the United States Supreme Court handed down its decision in *Harris* v. *New York,* 401 U.S. 222 [28 L.Ed.2d 1,

91 S.Ct. 643]. The *Harris* opinion is a complete answer to defendant's argument. The Supreme Court held, in *Harris,* that statements of a defendant which are inadmissible in the prosecution's case in chief because the defendant was not advised of his rights to counsel and to remain silent prior to making the statements, are nonetheless usable for impeachment purposes to attack the credibility of the defendant's trial testimony, if legal standards of trustworthiness are otherwise satisfied. The statements here meet the *Harris* test for use as impeachment.

Defendant contends the trial court's finding that the murders were of the first degree is not supported by the evidence. He relies principally upon the testimony and reports of his doctors, and upon his own testimony that he has no recollection of killing his wife, his mother-in-law, his brother-in-law and his mistress. He testified that some months before the killings he was severely beaten, suffering head injuries which he believed damaged his brain. He said that he suffered headaches intermittently between the time of the beating and the killings. He maintains that just before the killings his wife shoved him, causing him to bump his head, and from that point on he recalls nothing that happened. But the trial judge did not believe him, and the test, of course, is whether there is substantial evidence in the record to support the finding of the trial judge that defendant was guilty of murder in the first degree.

The determination of the degree of the crime is a factual determination, and a reviewing court is bound to review the evidence most favorably in support of the judgment. (*People* v. *Ford,* 65 Cal.2d 41, 51 [52 Cal.Rptr. 228, 416 P.2d 132]; *People* v. *Mosher,* 1 Cal.3d 379, 395 [82 Cal.Rptr. 379, 461 P.2d 659].)

Defendant's testimony that he did not recall what happened at the time he killed his wife, his mother-in-law and his brother-in-law was contradicted by the testimony of his cousin. He testified that at 3:20 or 3:25 in the morning, defendant came to his house with his three children and asked the cousin to take the children to defendant's mother in Puerto Rico. He told his cousin that when he arrived home at 3 o'clock and saw his wife and a man arrive in a white car, they argued and he shot her three times. He said that he shot her mother once, and his brother-in-law twice. The physical evidence coincided with these statements. The cousin testified that he asked defendant to turn himself in and defendant said he would, and he asked for the weapon and defendant gave it to him with the request that he be allowed 8 to 10 minutes to arrive at the police department in Delano.

Further contradiction of defendant's testimony that he had no recollection of what occurred is found in the testimony of an officer who, while

working on another case, was parked near the home of defendant's mistress, at 5:30 a.m. Defendant blinked the porch lights, attracted the officer's attention and told him that he was the man he wanted, that he had killed his people. After getting into the police car, defendant told the officer he thought his girl friend was dead or had just died, that she was in the house, and upon investigation the officer discovered this was true. Thus, defendant's statements made a short time after the killings belie his statements made later, after time for reflection, that he could not remember.

As to the medical testimony which supports the judgment of murder, first degree, Dr. Matychowiak testified: "It was my opinion that he did not have disease, defect of reason or mentation, which would make him incapable of appreciating the character and quality of the acts charged nor would it have made him incapable of adhering to the right as to the acts charged." To the question, "Now, from your examination, your discussion with him, Doctor, did you form an opinion as to whether or not he had his mind—had the capacity at the time to form then the intent to kill someone, the ability to premeditate and deliberate," he answered, "It is my clinical impression that he did have the capacity to form intent."

Dr. Perelli-Minnetti responded to the question, "Now, first with respect to your—both interviews, did you form an opinion under the right and wrong test or the McNaughten Rule in California, and if you did would you express your opinion for us please": "I concluded that he was sane according to the McNaughten rule. I felt that he did not suffer from any defect, or disease or derangement which made him incapable of appreciating the character and quality of the acts or incapable of distinguishing between right and wrong as to the acts."

And to the question, "Did you form any opinion as to whether his ability to form specifically the intent to—an intent to kill and to deliberate and to meditate or ponder on that specific intent," he answered: "I felt that he had the capacity to form intent."

After ascertaining from Dr. Samler that he was familiar with the McNaughten rule in California, the district attorney asked: "And from your examination, did you form any opinion and conclusion as to whether or not the defendant was psychotic and whether he knew under the McNaughten Rule right from wrong and the nature and the quality of the acts he was alleged to have done?

"A. Yes, in my opinion he was not psychotic. And in my opinion he did know the nature and quality of the acts at the time of the alleged acts.

" . . . . . . . . . . . . . . . . .

"Q. Then I take it you found he did not suffer from any mental defect or disease or derangement rendering him incapable of appreciating the acts?

"A. No.

"Q. Further, Doctor, did you arrive at any opinion or conclusion as to whether or not he had the capacity at the time of the crime to form intent and to deliberate and to ponder and to premeditate on an intent such as the intent to kill?

"A. Yes. I saw nothing as a result of my examination that made me think that there was anything that would interfere with his ability to deliberate and form intent."

We conclude that evidence of a substantial nature supports the trial judge's finding that defendant was guilty of murder in the first degree as to all four counts.

■ Finally, we come to defendant's assertion in his in propria persona brief that his appointed counsel failed to protect his constitutional rights and properly conduct his defense. His contention as to his attorney's failure to protect his constitutional rights is answered by our conclusion that no such rights were violated. ■ When a defendant asserts that his constitutional right to adequate representation by competent counsel has been violated, the burden of sustaining the allegation rests upon him. (*People* v. *Hill,* 70 Cal.2d 678, 688-689 [76 Cal.Rptr. 225, 452 P.2d 329].) ■ Defendant has failed to demonstrate that his case was reduced to "a farce or sham" (*People* v. *Ibarra,* 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487]). On the contrary, it appears that defendant was ably defended by an experienced criminal trial lawyer who did as well as could be done in view of the facts and circumstances of the case. As to any language difficulty, we note that defendant's attorney, who speaks Spanish, had no difficulty in communicating with him. In addition, a court-appointed interpreter was present at all court proceedings.

Our review of the record convinces us that defendant was fairly tried, and properly convicted of murder in the first degree on all four counts.

The judgment is affirmed.

Gargano, J., and Brown (G. A.), J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 6, 1971. Peters, J., was of the opinion that the petition should be granted.